2025 IL App (1st) 241574-U

No. 1-24-1574

Order filed November 12, 2025

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| GUARANTEED RATE INC., | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant and Cross-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 23 L 10265 |
| | ) | |
| REBECCA MOTT, | ) | Honorable |
| | ) | Jerry A. Esrig, |
| Defendant-Appellee and Cross-Appellant. | ) | Judge, presiding. |

_____

JUSTICE LAMPKIN delivered the judgment of the court.
Presiding Justice Martin and Justice Reyes concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The judgment of the trial court vacating the arbitrator's award of attorney fees and costs is reversed, but the trial court's judgment confirming the arbitrator's award of compensatory damages for breach of fiduciary duty is affirmed.

¶ 2    Plaintiff Guaranteed Rate Inc. (GRI) sued its former employee, defendant Rebecca Mott, for breach of contract, breach of fiduciary duty, conversion, and violations of the Federal Wiretapping Act and Illinois Eavesdropping Act. Defendant countersued for violations of the Lanham Act, the Illinois Right to Publicity Act, Illinois Fraud and Deceptive Business Practices

Act, and Illinois Wage Payment and Collection Act. The matter proceeded to arbitration where the arbitrator found that defendant breached her fiduciary duty to plaintiff and violated the Illinois Eavesdropping Act. The arbitrator awarded plaintiff $332,760.97 in damages, $238,494.09 in attorney fees, and $24,375 in costs. Defendant then sought review of the arbitrator's award in the trial court, which vacated the portion of the arbitrator's award concerning attorney fees and costs but otherwise confirmed the compensatory damages awarded to plaintiff.

¶ 3    Plaintiff appeals, arguing that the trial court erred by vacating the arbitrator's award of attorney fees and costs. Defendant cross-appeals, defending the trial court's judgment in that respect, but also arguing that the trial court erred in confirming the arbitrator's compensatory damages award.

¶ 4    For the reasons that follow, we reverse the judgment of the trial court vacating the award of attorney fees and costs, but otherwise affirm the remainder of the trial court's judgment which confirmed the arbitrator's award.[1]

¶ 5                                    I. BACKGROUND

¶ 6    The arbitrator in this case issued a 56-page interim award on May 2, 2023, that recites in detail the facts of the underlying litigation which we now summarize.

¶ 7    Defendant began her employment with plaintiff in March 2014 as a vice president of mortgage lending in plaintiff's Frankfort, Illinois office. Her role required her to locate customers who wanted a mortgage or who wanted to refinance an existing loan, then arrange for and close those loans. Defendant had 15 years of experience in the mortgage lending business before starting

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

her employment with plaintiff and brought with her a list of approximately 1,000 clients from her prior employer. Defendant was expected to generate her own business, and plaintiff would not provide her with leads.

¶ 8     At the time of her hire, defendant signed an agreement setting out the terms of her employment. Defendant was responsible for the cost of a sales assistant working underneath her, and plaintiff agreed to reimburse defendant $3,333.33 per month to offset that cost. Between March 2014 and May 2019, defendant closed over $25 million in loans and earned between $300,000 and $400,000 each year.

¶ 9     In May 2019, plaintiff promoted defendant to the position of branch manager for a new office in Mokena, Illinois. Defendant began the new role on May 7, 2019, with new assistants, Lauren Mitchell and Daniel Rodriguez, supporting her. Defendant continued to work under the 2014 employment agreement and she continued to pay a portion of her commissions toward the cost of one of her assistants.

¶ 10    In October 2019, defendant presented plaintiff with a new employment agreement (2019 Agreement). The 2019 Agreement required her to continue to pay for Rodriguez out of her own commissions and defendant would credit her $3,333.33 each month. The 2019 Agreement did not reference Mitchell, but plaintiff continued to deduct Mitchell's pay from defendant's commissions and credit defendant $3,333.33 each month to offset that cost. The 2019 Agreement contained a confidentiality provision which prohibited defendant from using plaintiff's confidential information for personal benefit or divulging that information for the benefit of any competitor, customer, or other person. The definition of "confidential information" was broad and covered a number of topics which we need not recite exhaustively. However, for example, the agreement

prohibited divulging information about plaintiff's sales, operations, financial projections, profit margins, client identities, client relationship histories, and client records.

¶ 11    However, plaintiff's data policies also permitted a departing loan officer to request a copy of data pertaining to customers or potential customers that he or she provided to plaintiff at the time of hiring. Obtaining a copy of such information required the departing employee to formally request the information within 60 days following termination of employment. The 2019 Agreement also contained two provisions relevant to this appeal. The first was the mandatory arbitration clause, which required the parties to arbitrate any and all claims that might arise with several types of claims exempted. The second provision, regarding attorney fees and costs, stated: "The Company may recover from you its attorney fees and costs relating to any action to enforce, defend, and/or prosecute this Agreement."

¶ 12    On November 18, 2019, defendant began an extended medical leave of absence. Before beginning that leave, defendant had a meeting with Rodriguez, Mitchell, Jim Eboli, a sales manager for plaintiff, and Roy Lux, a loan officer for plaintiff in the Mokena office. Lux would handle new loan applications and defendant agreed to pay Lux a bonus for each loan he closed on behalf of defendant.

¶ 13    During her leave, defendant entered into discussions with CrossCountry Mortgage (CCM), a direct competitor of plaintiff. Around December 19, 2019, defendant told Mitchell and Rodriguez that she was considering taking a position with CCM and asked them to join her. Throughout December 2019 and January 2020, defendant continued to engage in discussions with Mitchell and Rodriguez about working for CCM.

¶ 14    Prior to resigning from plaintiff's employ, defendant informed CCM about the details of Mitchell's and Rodriguez's compensation. Additionally, prior to defendant resigning and at defendant's request, Rodriguez obtained a spreadsheet containing information about defendant's clients from plaintiff's proprietary database. This contained names and contact information, as well as loan amounts, credit scores, interest rates, and the type of loan given. Rodriguez sent an email to his personal email account containing the spreadsheet, but titled the email "Receipts." Rodriguez then forwarded the email from his personal account to defendant's personal email.

¶ 15    On January 29, 2020, defendant made a formal request to plaintiff for a copy of her customer database, despite obtaining that information from Rodriguez already.

¶ 16    On February 4, 2020, Mitchell sent defendant an email with an attached spreadsheet containing client names and contact information, which was titled "Birthday Wish List." Defendant officially became an employee of CCM on February 4, 2020. The following day, Mitchell sent defendant a text that said, "I'm going to email your database to you on your personal email Danielle [a CCM employee] too she's gonna help clean it up." Mitchell remained in plaintiff's employ.

¶ 17    In the evening on February 5, 2020, John Elias, plaintiff's chief strategy and revenue officer, called defendant from his home to discuss her departure. Without his consent, defendant recorded the phone call. Rodriguez also tendered his resignation on February 5, 2020, and informed plaintiff that he was going to work for defendant at CCM.

¶ 18    Shortly after beginning work at CCM, defendant provided CCM with a version of the client information Rodriguez provided to her in the "Receipts" email so CCM could market refinancing opportunities to plaintiff's customers.

¶ 19    On February 12, 2020, Anwar Shatat, associate general counsel for plaintiff, emailed defendant to inform her that plaintiff was aware of defendant's efforts to procure confidential information about plaintiff's clients prior to her departure. Shatat accused defendant of using her formal request for client information to conceal the fact that she had already obtained the information improperly. Shatat insisted that defendant provide a full accounting of the information defendant took and to immediately cease using that information as part of her employment with CCM.

¶ 20    Between February 2020 and April 2020, plaintiff continued to use defendant's likeness and contact information on information distributed to its customers and continued to use defendant's name and contact information on its online payment portal for customers. Mitchell, who remained in plaintiff's employ, continued to use a voicemail greeting that represented she was defendant's assistant until April 8, 2020, when defendant's lawyer demanded that the voicemail be changed.

¶ 21    On April 7, 2020, plaintiff filed a complaint in the Circuit Court of Cook County which alleged two counts against defendant: (1) breach of contract and (2) breach of fiduciary duty under case number 2020 L 004010. Plaintiff later filed a demand for arbitration with the American Arbitration Association (AAA).

¶ 22    In its demand, plaintiff alleged a number of different claims: (1) breach of contract; (2) breach of fiduciary duty; (3) civil conspiracy; (4) misappropriation of confidential data; (5) aiding and abetting breach of fiduciary duty; (6) tortious interference with contract; (7) fraud; (8) conversion; (9) violation of the Federal Wiretapping Act; and (10) violation of the Illinois Eavesdropping Act. Plaintiff ultimately proceeded only on its breach of contract, breach of fiduciary duty, conversion, wiretapping, and eavesdropping claims. Defendant filed counterclaims

for violations of the: (1) Lanham Act; (2) Illinois Right to Publicity Act; (3) Illinois Consumer Fraud and Deceptive Practices Act; and (4) Illinois Wage Payment and Collection Act.[2]

¶ 23    A three-day hearing commenced on October 24, 2022, the testimony from which we have summarized above. In its May 2, 2023, interim award, the arbitrator rejected plaintiff's breach of contract, conversion, and wiretapping claims. However, the arbitrator found that defendant breached her fiduciary duty by providing CCM details about Rodriguez and Mitchell's compensation, and by taking information from plaintiff's customer database to use at her new job while she was still employed by plaintiff. It also found that defendant violated the Illinois Eavesdropping Act when she recorded her phone call with Elias.

¶ 24    With respect to defendant's claims, the arbitrator found that plaintiff violated the Lanham Act, the Illinois Right to Publicity Act, and the Illinois Wage Payment and Collection Act.

¶ 25    On July 12, 2023, the arbitrator issued its final award. It awarded plaintiff $332,760.97 for defendant's breach of her fiduciary duty. It also awarded defendant $19,000 for plaintiff's violation of the Illinois Right to Publicity Act claim and $54,642.43 for plaintiff's violation of the Illinois Wage Payment and Collection Act claim.

¶ 26    The arbitrator awarded plaintiff $238,494.09 in attorney fees and $24,375.65 in costs for a total award of fees and costs of $262,869.74. Conversely, the arbitrator awarded defendant $58,080 in attorney fees and $7,500 in costs for a total award of fees and costs of $65,580.

---

[2] Plaintiff also complained that defendant breached her fiduciary duty by soliciting Mitchell and Rodriguez to work for CCM. Because solicitation claims were exempted from the 2019 Agreement's mandatory arbitration provision, this claim was tried separately by the trial court and has no bearing on our review of the arbitrator's award.

¶ 27    On October 10, 2023, defendant[3] filed a petition in the Circuit Court of Cook County, under case number 2023 L 010265, seeking to vacate and/or modify the arbitrator's award. In her petition, defendant asserted that the arbitrator exceeded his authority and committed error by awarding attorney fees to plaintiff for its breach of fiduciary duty and Illinois Eavesdropping Act claims. She also claimed that the arbitrator erred in assessing compensatory damages for defendant's breach of fiduciary duty when plaintiff supplied no proof that defendant's breach resulted in actual damages. Defendant finally alleged that the arbitrator erred by deciding claims not covered by the 2019 Agreement's arbitration provision.

¶ 28    On June 28, 2024, the trial court held a hearing at which it determined that the arbitrator's interpretation of the 2019 Agreement was improper and that the arbitrator made a gross error of law by awarding plaintiff attorney fees and costs.

¶ 29    On July 8, 2024, the trial court entered an order granting defendant's petition to vacate the portion of the arbitrator's award that awarded attorney fees and costs to plaintiff in connection with plaintiff's breach of fiduciary duty and Illinois Eavesdropping Act claims. The trial court confirmed the remainder of the arbitrator's awards. Both parties appealed.

¶ 30                                    II. ANALYSIS

¶ 31    This case exemplifies the significant deference given to arbitrators and their decisions, and why parties who bargain for arbitration are bargaining for finality rather than one more link in the chain of expensive litigation.

---

[3] In the original action, GRI was the plaintiff and Mott was the defendant. While Mott was the plaintiff/petitioner in this subsequent action and GRI was the defendant/respondent, we will continue to refer to GRI as the plaintiff and Mott as the defendant for the sake of consistency and clarity.

¶ 32    Judicial review of an arbitration award is more limited than the review of a trial court's decision. *Galasso v. KNS Companies, Inc.*, 364 Ill. App. 3d 124, 130 (2006). Because the parties have agreed to have their dispute settled by an arbitrator, it is the arbitrator's view that the parties have agreed to accept, and the court should not overrule an award simply because its interpretation differs from that of the arbitrator. *Id*. There is a presumption that the arbitrator did not exceed his authority, and a court must construe an award, if possible, so as to uphold its validity. *Id*. A court has no power to determine the merits of the award simply because it strongly disagrees with the arbitrator's contract interpretation. *Id*. Furthermore, a court cannot overturn an award on the ground that it is illogical or inconsistent. *Id*. In fact, an arbitrator's award will not even be set aside because of errors in judgment or a mistake of fact or law. *Id*.

¶ 33    This "limited judicial review fosters the long-accepted and encouraged principle that an arbitration award should be the end, not the beginning of litigation." *First Health Group Corp. v. Ruddick*, 393 Ill. App. 3d 40, 48 (2009) (quoting *Perkins Restaurants Operating Co. v. Van Den Bergh Foods, Co*., 276 Ill. App. 3d 305, 309 (1995)). "When parties agree to submit a dispute to arbitration for a binding and nonappealable decision, they bargain for finality." *Ruddick*, 393 Ill. App. 3d at 48 (quoting *Yorulmazoglu v. Lake Forest Hospital*, 359 Ill. App. 3d 554, 564 (2005)). The purpose of arbitration is to provide a quick and economical alternative to litigation, not to add yet another round of litigation before entering the circuit and appellate courts. *Ruddick*, 393 Ill. App. 3d at 48.

¶ 34    Thus, the Uniform Arbitration Act sets out the very limited circumstances under which we may modify or vacate an arbitration award. 710 ILCS 5/1 *et seq.* (West 2020).  Under section 12(a) of the Act, we may vacate an award where: (1) the award was procured by corruption, fraud, or

other undue means; (2) the arbitrator was not impartial; (3) the arbitrator exceeded his powers; (4) the arbitrator unreasonably refused to postpone the hearing or hear material evidence; or (5) there was no arbitration agreement. 710 ILCS 5/12(a) (West 2020).

¶ 35    However, while a court cannot vacate an award due to errors in judgment or mistakes of fact or law, a court may vacate an arbitration award where a gross error of law or fact appears on the award's face, or where the award fails to dispose of all matters properly submitted to the arbitrator. *Galasso*, 364 Ill. App. 3d at 131.

¶ 36    Ultimately, "the question for the court is whether the construction of the contract made by the arbitrator is a reasonably possible one that can seriously be made in the context in which the contract was made. Stated affirmatively, if all fair and reasonable minds would agree that the construction of the contract made by the arbitrator was not possible under a fair interpretation of the contract, then the court would be bound to vacate or refuse to confirm the award." *Rauh v. Rockford Products Corp.*, 143 Ill. 2d 377, 391-92 (1991). To vacate an award based on a gross error of law, a reviewing court must be able to conclude that the arbitrator was so mistaken that, if apprised of the mistake, he would have ruled differently. *Herricane Graphics, Inc. v. Blinderman Const. Co., Inc.*, 254 Ill. App. 3d 151, 156 (2004). The challenger bears the burden to prove by clear and convincing evidence that an award was improper. *Id.*

¶ 37    With that framework in mind, plaintiff argues that the trial court erred in vacating the award of attorney fees because the arbitrator did not exceed his authority and because the trial court failed to apply the appropriate standard to the arbitrator's award. He further argues that the arbitrator would have reached the same result if apprised of the gross errors of law that defendant alleged below.

¶ 38    Defendant in turn responds that the trial court properly vacated the arbitrator's award because the arbitrator exceeded his authority and because the arbitrator's award was a gross error of law. As cross-appellant, defendant also argues that the trial court erred by not vacating the arbitrator's award of compensatory damages because the arbitrator exceeded his authority and because plaintiff failed to provide proof that defendant's breach of fiduciary duty caused a monetary loss.

¶ 39    We review the trial court's decision regarding the arbitrator's award *de novo*. *Anderson v. Golf Mill Ford, Inc.*, 383 Ill. App. 3d 474, 478 (2008); *Hawrelak v. Marine Bank, Springfield*, 316 Ill. App. 3d 175, 179 (2000). Of course, to say we perform our own *de novo* review is somewhat confusing. While we may not owe the trial court any deference and perform the same review that the trial court performed, that analysis still requires a high amount of deference to the arbitrator's decision as we have summarized above.

¶ 40                    A. The Arbitrator's Award of Attorney Fees to Plaintiff

¶ 41    We begin by examining the arbitrator's decision to award plaintiff attorney fees and costs, and the trial court's decision to vacate that award.

¶ 42    Section 10 of the Act states that, "Unless otherwise provided in the agreement to arbitrate, the arbitrator's expenses and fees, together with other expenses, not including attorney fees, incurred in the conduct of the arbitration, shall be paid as provided in the award." 710 ILCS 5/10 (West 2020). Thus, whether the arbitrator could award attorney fees as it did was a question of whether the 2019 Agreement empowered him to do so.

¶ 43    Section VII of the 2019 Agreement between plaintiff and defendant was a section entitled, "Mandatory Arbitration and Waiver of Right to Sue and Right to File Any Class or Collective

Action." Subsection (a) provided that, "Any and all claims (legal or equitable), demands, disputes, or controversies between you and the Company must be resolved by arbitration in accordance with the rules of the American Arbitration Association then in existence." Subsection (c) stated that the mandatory arbitration provision did not apply to claims for workers' compensation or unemployment benefits, claims for injunctive or equitable relief, including claims related to the unauthorized disclosure of confidential information; and any action brought related to or arising out of any non-solicitation violations.

¶ 44    Section IX of the 2019 Agreement, titled "Attorneys' Fees and Costs; Injunctive Relief," stated in relevant part, "The Company may recover from you its attorneys' fees and costs relating to any action to enforce, defend, and/or prosecute this Agreement."

¶ 45    In its final award, the arbitrator offered this reasoning to explain how it construed the 2019 Agreement:

> "Mott next argues that GRI's fees and costs incurred in connection with its breach of fiduciary duty and Illinois Eavesdropping Act claims were not covered by Section IX because they were not incurred in an 'action to enforce, defend and/or prosecute this Agreement.' According to Mott, GRI's breach of fiduciary duty and Illinois Eavesdropping Act claims were separate and independent causes of action that did not depend on enforcing, defending or prosecuting the 2019 Agreement. Mott reads the 2019 Agreement too narrowly. The arbitration provision contained in Section VII of the 2019 Agreement states, in part, that 'any and all claims *** demands, disputes or controversies between Mott and GRI must be resolved by arbitration.' Thus, any claim that fell within the 2019 Agreement's broad arbitration provision, including GRI's fiduciary duty and Illinois

Eavesdropping Act claims, were subject to the attorneys' fees and costs provision contained in Section IX."

¶ 46    At the hearing on June 24, 2024, the trial court said this about the arbitrator's reasoning: "The fee shifting provision and the arbitration clause are not coextensive. That is apparent on the face of the agreement. The arbitrator offered no legal justification for ignoring the difference. He did not identify any ambiguity in the language of either provision. He did not identify any legal principle that would justify enlarging the scope of the fee shifting provision beyond the plain meaning of the language used."

¶ 47    The trial court further reasoned that, "Had the parties wished to extend the fee shifting provisions to any and all actions between them or to any and all actions subject to arbitration, they could have done so," and that "Under the arbitrator's interpretation, every claim brought by GR is subject to the fee shifting clause as long as GR tacks on an unsuccessful claim for breach of the agreement." The trial court also explained, "The phrase 'relating to' means what it says. The fees must be related to an action to enforce, defend or prosecute. It does not mean that the fees must be related to an action which is related to an action to enforce, defend or prosecute."

¶ 48    There is merit to the trial court's interpretation of the contract. Indeed, Section VII and Section IX of the 2019 Agreement do not appear to be coextensive. But there is also logic to the arbitrator's interpretation, as well. He reasoned that the 2019 Agreement mandated arbitration for any and all claims, with a subset of exemptions, and therefore the claims which did fall within the mandatory arbitration provision were also actions to enforce, defend, or prosecute the 2019 Agreement. The net effect of the arbitrator's interpretation is not, as the trial court concluded, that "every claim brought by [plaintiff] is subject to the fee shifting provision as long as [plaintiff]

tacks on an unsuccessful claim for breach of the agreement." That conclusion is not supported by the arbitrator's award.

¶ 49     Instead, the result of the arbitrator's interpretation is that plaintiff could recover fees for claims which fell within the mandatory arbitration provision, and could not recover fees for those claims that fell outside that provision. The arbitrator's interpretation also heads off the question of why plaintiff would draft a contract that requires arbitration of almost all claims, while simultaneously precluding the recovery of attorney fees from many of those claims. Defendant relies on multiple cases to demonstrate that the arbitrator's interpretation exceeded his authority here. However, those cases are distinguishable.

¶ 50     In *Lee B. Stern & Co. v. Zimmerman*, this court held that an arbitrator exceeded its authority in awarding attorney fees. *Lee B. Stern & Co. v. Zimmerman*, 277 Ill. App. 3d 423, 428 (1995). There, the arbitrator awarded fees and the defendant argued that the arbitrator was empowered to do so based on the arbitration agreement and the rules and regulations for the Chicago Board of Trade. *Id*. at 426-27. The arbitration agreement mandated that any controversy arising out of business between Board of Trade members should be submitted to arbitration. *Id*. Further, the rule in question stated: "A schedule of arbitration fees shall be established from time to time by the Arbitration Committee, with the approval of the Board. The Arbitrators, in the award, shall fix expenses and assess fees, in accordance with the Committee's schedule, in whatever manner they deem appropriate." *Id*. at 427. The defendants argued that the "in whatever manner they deem appropriate" language authorized the award of attorney fees. *Id*. We reasoned that the language of the rule was contingent on the Committee's fee schedule, and a review of that schedule contained no language authorizing arbitrators to award attorney fees. *Id*. at 427-28. Thus, the arbitrator

exceeded its authority by awarding attorney fees when there was no language authorizing attorney fees. *Id.* at 428.

¶ 51    Likewise, in *Hahn v. A.G. Becker Paribas, Inc.*, we affirmed the trial court's vacatur of an award of attorney fees (and unrelatedly, the entire award), because the arbitration agreement contained no authority for an award of attorney fees. *Hahn v. A.G. Becker Paribas, Inc.*, 164 Ill. App. 3d 660, 668, 671 (1987).

¶ 52    These cases are distinguishable from the present facts because in *Stern* and *Hahn* there was *no* language that authorized attorney fees. Here there is undeniably language in the 2019 Agreement that authorizes the award of attorney fees. The issue is the *scope* of that authorization. Defendant's argument entirely ignores this difference. This case is simply not the same as one where an arbitrator awarded attorney fees when there was no language *anywhere* that authorized an arbitrator to award attorney fees.

¶ 53    Our precedent instructs us that we cannot vacate an arbitrator's award even where it is illogical or inconsistent. *Galasso*, 364 Ill. App. 3d at 130. Here, while the arbitrator's interpretation may not be the *most* reasonable or *most* logical one, we cannot say that it is completely illogical, let alone an interpretation so beyond the bounds of reason that "all fair and reasonable minds would agree that the construction of the contract made by the arbitrator was not possible under a fair interpretation of the contract." *Rauh*, 143 Ill. 2d at 391-92. Our determination of what might be the most reasonable or most accurate interpretation is, for the purposes of this appeal, irrelevant. The parties bargained for the judgment of an arbitrator, and the fact that the trial court arrived at a different or more logically consistent interpretation of the 2019 Agreement does not warrant vacating the arbitrator's award.

¶ 54 Nor can we say that the arbitrator committed a gross error of law with its interpretation of the 2019 Agreement. Defendant urges us to find this case similar to *Shearson Lehman Bros., Inc. v. Hedrich*, where the agreement in question set out unambiguous terms regarding compensation, and the arbitrators "impermissibly ignored the unambiguous contract language and implemented their own notion of what would be reasonable and fair. *Shearson Lehman Bros., Inc. v. Hedrich*, 266 Ill. App. 3d 24, 26-27, 29 (1994).

¶ 55 Defendant also argues that this case is similar to *First Merit Realty Services, Inc. v. Amberly Square Apartments, L.P.*, where the agreement gave the parties the right to terminate the agreement at the end of any calendar month with 30 days' written notice. *First Merit Realty Services, Inc. v. Amberly Square Apartments, L.P.*, 373 Ill. App. 3d 457, 462 (2007). There, the defendants sent the plaintiffs written notice on March 21, 2003, that they intended to terminate the agreement effective April 30, 2003. *Id*. Despite the timely notice, the arbitrator ruled in favor of the plaintiffs and awarded damages. *Id*. We vacated the arbitrator's award because the arbitrator ignored the clear language of the agreement. *Id*. at 464.

¶ 56 *Shearson* and *First Merit* are distinguishable from the case before us, which does not involve unambiguous contract language. Section IX of the 2019 Agreement does not name or specify what claims or types of claims fall within the fee shifting provision. That section only states that it applies to "any action to enforce, defend, and/or prosecute this Agreement." Nowhere in the 2019 Agreement does it define or explain what "any action to enforce, defend, and/or prosecute this Agreement" means. Thus, it was left up to the arbitrator to interpret Section IX and how and whether it interacts with Section VII. This is not an instance where the arbitrator simply ignored unambiguous contractual terms.

¶ 57     As the arbitrator pointed out in its award, defendant argued for a narrower construction of the 2019 Agreement in the post-hearing brief submitted to the arbitrator. The arbitrator rejected that interpretation. To vacate an award based on a gross error of law, a reviewing court must be able to conclude that the arbitrator was so mistaken that, if apprised of the mistake, he would have ruled differently. *Herricane*, 254 Ill. App. 3d at 156. Here, the arbitrator had the opportunity to contemplate defendant's alternative proposed construction of the 2019 Agreement and rejected it. Whether we agree with the arbitrator's interpretation, or whether there is a better, more reasonable interpretation, is immaterial to our review. We lack the authority to determine the merits of an award even if we disagree with the arbitrator's interpretation of the contract at issue. *First Merit*, 373 Ill. App. 3d at 462. If we are not empowered to vacate arbitrators' awards even when they are illogical or inconsistent, the "all fair and reasonable minds" standard must require a greater lapse in judgment. In our estimation, the arbitrator's award in this case did not meet the high threshold necessary to vacate it.

¶ 58     Accordingly, we hold that the trial court erred in vacating the attorney fees and costs awarded by the arbitrator and reverse that portion of the trial court's judgment.

¶ 59                          B. Compensatory Damages for Breach of Fiduciary Duty

¶ 60     The trial court confirmed the arbitrator's award of compensatory damages for defendant's breach of fiduciary duty, and defendant, as cross-appellant, now argues that the trial court erred in doing so. Specifically, defendant argues that the arbitrator decided an issue exempted from the 2019 Agreement's mandatory arbitration clause and that the arbitrator made a gross error of law because plaintiff failed to prove that defendant's breach of fiduciary duty caused damages.

¶ 61     1. Whether the Arbitrator Decided an Issue Exempt from Arbitration

¶ 62     Defendant claims that the arbitrator improperly determined that she breached her fiduciary duty in part because she solicited Mitchell and Rodriguez to join her at CCM even though plaintiff made no such claim and the 2019 Agreement specifically exempted solicitation claims from the mandatory arbitration provision. Therefore, she claims that the trial court erred when it confirmed the arbitrator's award.

¶ 63     A careful review of the arbitrator's award reveals that the damages for defendant's breach of fiduciary duty were based on defendant's disclosure of confidential compensation information for Mitchell and Rodriguez, which allowed CCM to make them competitive offers, as opposed to defendant's actual solicitation, and for defendant's disclosure of confidential client information. Although the interim award stated, "By actively recruiting her assistants to join CCM and providing CCM with Mitchell and Rodriguez's compensation while she still worked for GRI, Mott clearly breached her fiduciary duty," it is virtually impossible to discuss defendant's other actions that constituted her breach without referencing her attempts to convince Mitchell and Rodriguez to join her at CCM.

¶ 64     The award's damage calculation was almost entirely based on plaintiff's lost profits in the form of loan customers, $282,662.27, and defendant's compensation paid during the time period in which she was breaching her fiduciary duty, $46,578.70. The arbitrator declined to award any damages for the cost plaintiff incurred to hire Rodriguez's replacement, and only awarded $3,520 for the increased wages Mitchell earned during defendant's breach. The only conceivable claim that could be considered part of a solicitation claim was the issue of the cost to hire Rodriguez's

replacement. Given that the arbitrator awarded no damages on that front, if the arbitrator was considering that issue as one of solicitation, it was entirely harmless.

¶ 65    Our review indicates that the arbitrator did not specifically decide a claim that defendant breached her fiduciary duty by soliciting plaintiff's employees—a claim that plaintiff did not raise before the arbitrator. In fact, at the hearing before the trial court, the trial court sought clarification on that point. It stated to the parties:

> "[A]s I understand it, there are two separate breach of fiduciary duty claims. There's a breach of fiduciary duty claim based on the use of or disclosure of confidential information. There's a separate breach of fiduciary duty claim based on the solicitation of employees while Mott remained employed by the company. As I understand it, the first of those claims by agreement was tried to the arbitrator. The second of those claims by agreement was tried to me."

¶ 66    Counsel for both parties agreed that that was an accurate statement of the case. The record does not reflect that the arbitrator decided any solicitation claims, nor did the arbitrator award damages for a solicitation claim. We agree with the trial court's explanation that it was impossible for the arbitrator to discuss defendant's breach related to the disclosure of confidential information without discussing defendant's solicitation of plaintiff's employees—those operative facts were inseparable. On that basis, the trial court did not err in confirming the arbitrator's award.

¶ 67                              2. Proof of Causation for Lost Profits

¶ 68    Next, we address defendant's claim that the arbitrator made a gross error of law when it awarded compensatory damages for lost profits as a result of defendant's breach without any proof

- 19 -

that defendant's breach actually caused the damages. Following the hearing, the arbitrator awarded plaintiff $282,662.27 in lost profits as a result of defendant's breach.

¶ 69    During the arbitration hearing, John Elias testified that plaintiff was making 420 basis points, or 4.2%, in revenue from every loan it made to a customer. Elias identified the number of loans closed by defendant while in CCM's employ in 2020 and 2021 where the customers were individuals on the "Receipts" list that defendant had emailed to her by Rodriguez. Elias testified that the total amount of lost revenue for those loans, using the 420 basis points standard, was $826,967.44. These damages came from numerous loans totaling over $19 million. Elias also testified that, at the time of the breach, interest rates were low and the overwhelming majority of homeowners in the United States were eligible for refinancing. Thus, he explained that a list containing plaintiff's customers, FICO scores, and loan amounts would have been extremely valuable and enabled CCM to make plaintiff's customers more competitive loan offers.

¶ 70    Defendant argues that Elias testified at the arbitration hearing that he did not know if any of plaintiff's confidential data was used by CCM to market loans or refinancing opportunities to plaintiff's customers. He also admitted plaintiff would have no damages for lost profits if defendant did not use any confidential information to close loans with any of plaintiff's customers. Accordingly, defendant claims that the arbitrator lacked any evidence to show that defendant's conduct was responsible for lost profits.

¶ 71    Defendant's argument ignores her own testimony, however, which the arbitrator relied upon heavily in its award. At the hearing, defendant admitted that she gave someone named Rob Sampson at CCM a version of the list of plaintiff's customers that Rodriguez provided to plaintiff. When defendant was asked as a follow-up, "And then [CCM] could market to those borrowers you

had filtered from the receipts spreadsheet to refinance their loans, correct?" she replied, "Yeah. I'll — I'll agree to this."

¶ 72    In other words, the hearing testimony established that: (1) defendant took confidential data from plaintiff which included the identities of loan customers, their credit scores, and the associated interest rate; (2) defendant gave that information to her new employer, CCM, for the purpose of allowing CCM to solicit loans to these customers; and (3) between 2020 and 2021, CCM closed approximately $19 million in loans to customers on that list. As circumstantial evidence that plaintiff's confidential data gave CCM an advantage in marketing loans to plaintiff's customers, we also cannot ignore the effectiveness of CCM's campaign after hiring defendant. Between March 2014 and May 2019, defendant closed $25 million in loans; on average slightly less than $5 million per year. In a mere fifteen months, with access to plaintiff's confidential information, CCM closed loans with plaintiff's customers totaling more than $19 million.

¶ 73    Far short of simply being speculative as defendant claims, the hearing evidence provided clear circumstantial evidence that allowed the arbitrator to conclude that CCM and defendant used plaintiff's confidential information to close the aforementioned loans. With that factual basis, the trial court did not err in confirming the arbitrator's award because the arbitrator did not commit a gross error of law. We lack the authority to vacate even awards that are illogical or inconsistent. The arbitrator's conclusion here does not rise to the level of being illogical or inconsistent. Nor can we say that the arbitrator was so mistaken that, if apprised of the mistake, he would have ruled differently. *Herricane*, 254 Ill. App. 3d at 156. To the contrary, the conclusion that defendant's act of giving plaintiff's customer data to CCM with the express purpose of being able to market loans to those customers resulted in plaintiff's lost profits is perfectly rational.

¶ 74    Finally, defendant also makes the puzzling argument that the arbitrator's decision to limit plaintiff's damages to the four-month period after defendant joined CCM was a gross error of law warranting vacatur of the arbitrator's compensatory damages award. The arbitrator limited his damages calculation to only those loans closed in the first four months after defendant joined CCM because after four months, the arbitrator reasoned, it would be likely that defendant's former customers would have followed her to CCM regardless of whether defendant breached her fiduciary duty.

¶ 75    As plaintiff points out, this limitation was to defendant's benefit, resulting in a damages award of $282,662.27 of lost profits rather than a calculation of lost profits for every loan that CCM made to plaintiff's customers between February 2020 and May 2021, which plaintiff claimed amounted to $826,967.44. In doing so, the arbitrator reduced plaintiff's potential damages by approximately two-thirds.

¶ 76    Defendant takes issue with this four-month limitation on the basis that the arbitrator cited no evidence to support it. No evidence specifically supported the four-month limitation as opposed to three months, five months, or any other amount of time. The arbitrator simply reasoned that plaintiff's damage calculation "[did] not factor in the fact that Mott had a large and loyal client base and many of those customers would have sought her out at her new employer once they learned she was no longer with GRI."

¶ 77    Perhaps there is some illogic to the arbitrator's decision to use the four-month threshold as opposed to any other threshold. But the conclusion that defendant's client base would have eventually learned of her departure and some clients would have followed her even without defendant's breach is a reasonable and realistic one.

¶ 78    The arbitrator was the one that heard the testimony related to defendant's pre-existing client base and evaluated its credibility. He clearly determined that defendant did, in fact, have a loyal client base and made the judgment to only consider damages within the first four months of defendant's departure. This four-month time frame worked in defendant's favor by significantly curtailing her exposure in terms of damages. As the trial court explained, the arbitrator was not required to abandon his common sense and is permitted to draw reasonable inferences and draw on experience from everyday life. The arbitrator made the commonsense judgment that some of defendant's customers would have followed her eventually, but recognized the difficulty, and perhaps impossibility, of determining how long that would take. As a result, the arbitrator selected an amount of time that heavily favored defendant by eliminating the majority of plaintiff's claimed damages.

¶ 79    In essence, after concluding that defendant did, in fact, misappropriate confidential information and breach her fiduciary duty—a finding defendant has not contested—the arbitrator gave defendant the benefit of the doubt as to the time period being considered to calculate damages. Even if we determined that the arbitrator's reasoning was illogical, it does not rise to the level that no fair and reasonable minds could agree with the arbitrator's award. *Canteen Corp. v. Former Foods, Inc.*, 238 Ill. App. 3d 167, 186 (1992). Nor is this an instance where the arbitrator was so mistaken that he would have ruled differently if apprised of the mistake.

¶ 80    Accordingly, the trial court did not err in declining to vacate the arbitrator's compensatory damages award.

¶ 81                    C. Motion to Supplement the Record

¶ 82    Lastly, we dispose of a pending motion to supplement the record on appeal. On April 14, 2025, defendant moved this court to supplement the record on appeal with the November 7, 2024, order from the trial court which decided plaintiff's breach of fiduciary duty claim based on the solicitation of plaintiff's employees. Appended to defendant's motion was a copy of the November 7, 2024, order. This court entered an order on April 16, 2025, stating that defendant's motion would be taken with the case.

¶ 83    We deny defendant's motion. The trial court's order in question did not decide a claim that was presented to the arbitrator, and does nothing to further the consideration of the issues before this court. While defendant insists in his motion that this order is "integral to the appeal," we fail to see how and she offers no explanation beyond conclusory statements. More importantly, Supreme Court Rule 329 makes it clear that the proper procedure for supplementing the record on appeal is by having the clerk of the circuit court "prepare a certified supplement to the record which shall be filed in the reviewing court upon order issued pursuant to motion." Ill. S. Ct. R. 329 (eff. July 1, 2017). No proposed supplement was ever provided to us by the clerk of the circuit court. Simply attaching a document, the origin of which has not been certified by the clerk of the circuit court, is not the prescribed procedure for supplementing the record. Defendant's repeated references to this order in her brief have not factored into our disposition of this appeal.

¶ 84                             III. CONCLUSION

¶ 85    For the foregoing reasons, we reverse the portion of the judgment of the trial court that vacated the arbitrator's award of attorney fees and costs, and affirm the portion of the trial court's

judgment that confirmed the arbitrator's award of compensatory damages for defendant's breach of fiduciary duty.

¶ 86    Reversed in part; affirmed in part. Defendant's motion to supplement the record taken with the case is denied.